IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| OPTIV SECURITY INC.,<br>1144 15th Street, Suite 2900<br>Denver, CO 80202 | )<br>)<br>)<br>) |
| **Plaintiff,** | )<br>) |
| v. | )<br>) |
| GENERAL DATATECH, L.P. | ) **Case No.:**<br>) |
| GDT INNOVATION CAMPUS<br>999 Metromedia Place<br>Dallas, TX 74247 | )<br>)<br>)<br>) |
| SERVE AT: | )<br>) |
| Corporation Service Company d/b/a CSC<br>Lawyers Incorporating Service Company,<br>211 E. 7th Street Suite 620, Austin, TX<br>USA 78701 | )<br>)<br>)<br>)<br>) |
| NATHAN BRADY<br>7465 Deer Ridge Drive<br>Shawnee, KS 66227 | )<br>)<br>)<br>) |
| **Defendants.** | )<br>) |

VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF
AND JURY DEMAND

Plaintiff Optiv Security Inc. ("Optiv" or the "Company"), for its Complaint for Injunctive

and Other Relief against Defendant General Datatech, L.P. ("GDT") and individual Nathan Brady

("Brady"), (collectively referred to herein as "Defendants"), states as follows:

PARTIES AND JURISDICTION

1.      This is an action seeking injunctive relief and other relief based on Defendants'

violation of Kansas law and Brady's breach of his Agreement.

2.      Optiv is a Delaware corporation, operating its principal place of business at 1144

15th Street, Suite 2900, Denver, Colorado 80202. Optiv regularly conducts business in the state of Kansas and the greater Kansas City Metropolitan area from one of its primary offices at 5100 W. 115th Place Leawood, Kansas 66211.

3.      GDT is a Texas Limited Partnership with its principal place of business at 999 Metro Media Place, Dallas, Texas.

4.      Upon information and belief Brady is a resident of the State of Kansas with an address at 7465 Deer Ridge Drive Shawnee, Kansas 66227.

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because at least one claim is based on a federal question; specifically, Plaintiff's cause of action brought pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq.

6.      This Court has supplemental subject matter jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

7.      This Court has personal jurisdiction over Brady as a resident of the State of Kanas.

8.      This Court has personal jurisdiction over GDT pursuant to K.S.A. § 60-308(b) as GDT has:

a.      committed a tortious act in the State of Kansas as alleged in Counts V-VI;

b.      upon information and belief entered into a contract with Brady who is a resident of the State of Kansas; and

c.      maintained sufficient minimum contacts with the State of Kansas through its solicitation of Brady to become employed by GDT.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 as:

a.      A substantial part of the events giving rise to Optiv's claims occurred in this judicial district; and

b.      Brady is subject to the personal jurisdiction of this court.

90542583.1

## GENERAL ALLEGATIONS

10.     Brady has worked at Optiv since July 1, 2013, most recently Brady has served as the Chief Financial Officer since April 2, 2018.

11.     On June 30, 2023, Brady informed Optiv that he would be resigning his employment with Optiv.

12.     On July 6, 2023, counsel for Optiv sent Brady a letter regarding his "January 22, 2015, Employment Agreement and Reminder of Your Post-Employment Obligations." *See* **Exhibit A**.

13.     In the July 6, 2023, letter Brady was reminded of his obligations not to compete and his duty not to disclose confidential information.

14.     Optiv is engaged in the highly competitive business of providing end-to-end cybersecurity solutions to companies throughout the United States and internationally.

15.     Cybersecurity products and services are sold from partner vendors at various pricing levels depending on if Optiv, or another entity in competition with Optiv, is able to secure preferred pricing with the vendors for their customers.

16.     In addition to selling various cybersecurity products, Optiv also offers various cybersecurity solutions and services including, but not limited to services relating to monitoring threats, installation and integration of products in a customer's current infrastructure, SASE architecture services, and other services relating to cybersecurity.

17.     During the course of his ten-year tenure, Brady has played an instrumental role in Optiv becoming a leader in the cybersecurity industry.

18.     Specifically, Brady was crucial in the push and growth of Optiv's cybersecurity services offerings.

90542583.1

19.     Optiv invests substantial resources in marketing, real estate, promotional activities, and the provision to the public of professional, credible, and trustworthy cybersecurity services. Association with Optiv imbues its employees with a heightened credibility associated with the Optiv brand – certainly in comparison to others who have not had the benefit of working for Optiv.

20.     As Chief Financial Officer, Brady was privy to information regarding products, services, marketing and business plans, budgets, financial statements, contracts, prices, profit margins; the names, addresses, phone numbers, preferences, buying and/or selling histories and other information concerning suppliers, vendors, customers and prospective customers of the Company; databases and data collections, diagrams or designs, models, formulae, inventions (whether or not patentable), patent applications, trade secrets, know-how, registered and unregistered marks and all goodwill associated with such marks, methods, processes, procedures, software and software code (in any form, including source code and executable code), subroutines, techniques, user interfaces, domain names, URLs, web sites, registered and unregistered copyrights, works of authorship and other forms of technology or technical information, and other information (whether or not embodied in any tangible form and including all tangible embodiments of the foregoing, such as instruction manuals, prototypes, samples, studies and summaries) and any reissues, extensions or renewals thereof; information regarding the skills and compensation of Company's employees, contractors, and any other service providers of Company; and the existence of any business discussions, negotiations, or agreements between Company and any third party; provided, however, Confidential Information shall not include any information that is generally known in the industry or otherwise becomes available in the public domain (referred to in the Executive Agreement and herein as "Confidential Information").

21.     Prior to becoming Optiv's Chief Financial Officer, Brady served as Optiv's

90542583.1

controller and quickly ascended to the role of Chief Accounting Officer.

22.     In these roles, Brady was instrumental in steering the strategic and operational direction of the finance department beyond financial and transactional management; he further played a key role in Optiv's transformation to strategic decision making based on real-time and accurate data.

23.     As Chief Financial Officer, Brady reported directly to Optiv's Chief Executive Officer and one of the six members that comprised the CEO's Executive Officers or Executive Team.

24.     At the time of filing of this Complaint, Brady's annual base salary at Optiv was $475,000. In addition, Brady received other bonus compensation and equity considerations.

25.     Although Brady's official title at Optiv was Chief Financial Officer, he also acted as a Chief Operating Officer as his duties extended well beyond the traditional Chief Financial Officer title.

26.     For example, in his role he was responsible for supervising the following divisions: Finance, which includes, but is not limited to: Accounting, Treasury, Tax, Payroll, In-house Corporate Travel; and Information Technology, which includes, but is not limited to: Enterprise Applications & Platform Engineering, Enterprise Business Transformation, Global Data & Digital Technology, and Global Infrastructure, Cloud & Engineering.

27.     Optiv is engaged in highly commercially sensitive acquisition talks with various companies as part of strategic initiatives to grow and expand its capabilities, services, and market share.

28.     As Chief Financial Officer, Brady was materially involved in preliminary talks, negotiations, and strategy meetings regarding Optiv acquisitions and strategic partnerships.

29.     As Chief Financial Officer Brady therefore has intimate knowledge of Optiv's confidential and trade secret acquisition strategy to expand in the market.

30.     In addition, Brady was responsible for financial forecasting and modeling based on Optiv's past performance, as well as other confidential internal factors that have an impact on revenue and expenses.

31.     Based on all this knowledge of Optiv's confidential information, Brady had intimate knowledge and contributed to Optiv's three-year growth strategy which was developed in 2023.

32.     Brady is one of the very few people within Optiv who are aware of this strategy and what entities Optiv is looking to acquire and where Optiv is seeking to expands its capabilities and services.

33.     Brady was a part of various leadership and strategy groups that worked on business strategy and plans to ensure Optiv was competitive and a leader in the industry.

34.     For example, Brady has knowledge of how Optiv manages and approaches vendor relationships in order to leverage better deals and prices for Optiv clients.

35.     Brady regularly communicated with several internal business councils at the request of Optiv's Chief Executive Officer.

36.     Optiv has a Data Analytics Council which brings together a cross organizational group who is responsible for developing and leveraging data analysis to drive better business outcome by convening a cross-organizational group to evaluate business opportunities, prioritize needs, allocate resources, and share learnings.

37.     The Data Analytics Council coordinated the repository of data analytics and established and maintained the analytical standards that Optiv used to support and influence its

long-term strategies.

38.     The Data Analytics Council was under the purview of Brady.

39.     By being responsible for and by receiving data and communications from Optiv's Data Analytics Council, Brady was privy to how Optiv analyzed data from seven years of customer transactions to maximize performance in the competitive cybersecurity industry.

40.     As part of the Data Analytics Council, Brady had access to and has deep knowledge of Optiv's materials and products and their respective pricing; customer contacts and contact information; employee and workforce structures, roles, compensation plans, etc.; and Optiv financials – all of which is Confidential Information.

41.     The data and communications included highly Confidential Information related to Optiv pricing pros and cons, breadth and depth of customer purchases based on customer industry, size, and types.

42.     Optiv's Data Analytics Council, including Brady, used this Confidential Information to assemble and build specific discreet transactions and develop Optiv's strategic business plans to ensure it remains competitive and a leader in the cybersecurity industry.

43.     Optiv has a Product Leadership Council that is responsible for partner selection and convening, development, and launch strategy and execution of Optiv innovative solutions.

44.     As Chief Financial Officer, Brady received updates regarding the Product Leadership Council communications, meetings, and was privy to information such as what cybersecurity services were being requested from various customer markets as to inform Optiv's decisions on where to invest funds in the development of various services and what services could be decommissioned based on lack of interest by markets.

45.     Brady maintained throughout his tenure direct hands-on management of vendor

rebate programs and terms.

46.     This hands-on management provided Brady with intimate familiarity with whether, to what extent, and how rebate programs with Optiv's solutions vendors are developed and maintained.

47.     By nature of being responsible for Optiv's Information Technology Division, Brady was familiar with what major technology vendors, projects, and IT infrastructure is necessary to serve as an international company performing services related to cybersecurity.

48.     Brady was deeply involved in the development and maintenance of payment plan options for Optiv customers that were funded both by Optiv internally and through private label partners, such as banks.

49.     Through Brady's involvement in Optiv's payment plans for customers, Brady was familiar with to what extent there is and was market demand for such plans, the pricing of a finance fee in different situations, and the methodologies that Optiv could deploy to ensure the success of such programs.

50.     Optiv enhanced the payment plan offerings to customers year after year since 2017 and Brady led its development and success.

51.     Over the past three years, Optiv has internally financed more than $321 million for customers through the payment plan system that Brady was responsible for establishing and growing.

52.     Brady has intimate knowledge of what customers in the cybersecurity industry can afford and personally approves the payment plan options to customers.

53.     Optiv has landed contracts and sales with customers solely through its payment plan and financing program, which provides it with a unique competitive advantage.

8

54.     Optiv takes reasonable measures to protect the confidentiality and trade-secret nature of Confidential Information, including requiring employees and executives, like Brady, to sign agreements in which they agree to maintain the confidentiality of such Confidential Information.

55.     Brady only had knowledge of Optiv's highly sensitive trade secrets and Confidential Information by virtue of the peculiar trust and confidence Optiv placed in Brady as Chief Financial Officer.

56.     Optiv's Confidential Information was developed over time and at substantial expense to Optiv.  To Optiv's knowledge, this Confidential Information is not known outside of Optiv, and if its competitors had access to Optiv's Confidential Information they could save substantial time and cost that they otherwise would have to expend to develop the information on their own.

57.     Throughout his career advancement Brady received significant mentoring and training on his various roles to enable him to perform his duties for Optiv's customers.

58.     In 2015, Accuvant and FishNet Security merged to become one of the largest pure-play cybersecurity solutions and services providers. As part of the integration process, the two main U.S. operating entities – Accuvant, Inc. and FishNet Security, Inc, each Delaware corporations – legally merged on July 1, 2015 under Delaware law and then became Optiv Security Inc. The holding company that was established as part of the merger was AF Holdings.

59.     Upon completion of the merger, Optiv became the successor to the Executive Agreement.

### The Agreements

60.     On January 22, 2015, Brady signed an Executive Employment Agreement (the

"Executive Agreement"). *See* Ex. A.

61.     In exchange for the promises and obligation in the Executive Agreement and its ancillary agreements, Brady was provided with fair and valuable consideration including, but not limited to: continued employment with AF Security Holdings Corp., consideration and benefits from the consummation of the Merger Agreement, and for Brady's regular compensation and benefits provided for in the Executive Agreement. *See* Ex. A.

62.     Optiv has performed all of its obligations under the Executive Agreement.

63.     Incorporated into Paragraph 6 of the Executive Agreement is a "Proprietary Information Agreement" that is attached as Exhibit C to the Executive Agreement which Brady executed on January 22, 2015. *See* Ex. A.

64.     Paragraph 8 of the Executive Agreement incorporates a "Noncompetition Agreement" attached as Exhibit D to the Executive Agreement, which Brady executed. *See* Ex. A

65.     The Executive Agreement, and all ancillary agreements, are governed by the laws of the State of Delaware. *See* Executive Agreement Ex. A, ¶ 12.1; *see also* Ex. C to Executive Agreement (Ex. A) at ¶ 6.1; *see also* Ex. D to Executive Agreement (Ex. A) at ¶ 8.1.

66.     In Paragraph 1.1 of Exhibit C to the Executive Agreement Brady agreed to:

At all times during and after my employment, I will hold in confidence and will not disclose, use or publish any of [Optiv's] Confidential Information . . ., except as may be required in connection with my work for [Optiv] or as expressly authorized by the Board of Directors of [Optiv].

Ex. C to the Executive Agreement (Ex. A) at ¶ 1.1.

67.     Paragraph 1.2 of Exhibit C to the Executive Agreement defines Confidential Information as:

Any and all confidential knowledge, data or information related to [Optiv's] business or its actual or demonstrably anticipated business or development, including without limitation (a) information regarding products, services,

marketing and business plans, budgets, financial statements, contracts, prices, profit margins; (b) the names, addresses, phone numbers, preferences, buying and/or selling histories and other information concerning suppliers, vendors, customers and prospective customers of the Company; (c) databases and data collections, diagrams or designs, models, formulae, inventions (whether or not patentable), patent applications, trade secrets, know- how, registered and unregistered marks and all goodwill associated with such marks, methods, processes, procedures, software and software code (in any form, including source code and executable code), subroutines, techniques, user interfaces, domain names, URLs, web sites, registered and unregistered copyrights, works of authorship and other forms of technology or technical information, and other information (whether or not embodied in any tangible form and including all tangible embodiments of the foregoing, such as instruction manuals, prototypes, samples, studies and summaries) and any reissues, extensions or renewals thereof; (d) information regarding the skills and compensation of Company's employees, contractors, and any other service providers of Company; and (e) the existence of any business discussions, negotiations, or agreements between Company and any third party; provided, however, Confidential Information shall not include any information that is generally known in the industry or otherwise becomes available in the public domain.

Ex. C to the Executive Agreement (Ex. A) at ¶ 1.2.

68.     In Paragraph 1.4 of Exhibit C to the Executive Agreement, Brady represented that he "will not enter into, any agreement, either written or oral, in conflict with my obligations under this Agreement." Ex. C to the Executive Agreement (Ex. A) at ¶ 1.4.

69.     In Paragraph 6.6 of Exhibit C to the Executive Agreement, Brady Agreed that "because [his] services are personal and unique and because [he had] access to the Confidential Information of [Optiv] for which monetary damages would not be an adequate remedy and, therefore, will entitle [Optiv] to injunctive relief."  Ex. C to the Executive Agreement (Ex. A) at ¶ 6.6.

70.     In Paragraph 1.1 of Exhibit D to the Executive Agreement, Brady agreed to not:

(a) engage directly or indirectly in Competition in any Restricted Territory;
(b) directly or indirectly be or become an officer, director, shareholder, owner, co-owner, Affiliate, partner, promoter, employee, agent, representative, designer, consultant, advisor, manager, investor, licensor, sub licensor, licensee or sublicensee of . . . any Person or entity that engages in Competition in any

Restricted Territory.

Ex. D to the Executive Agreement (Ex. A) at ¶ 1.1.

71.     Paragraph 17.5 of Exhibit D to the Executive Agreement states that the Noncompetition Period "shall mean the period commencing on the Effective Date and ending one (1) year from the date [Brady's] employment with [Optiv] . . . is terminated for any reason." Ex. D to the Executive Agreement (Ex. A) at ¶ 17.5.

72.     Paragraph 17.2 of Exhibit D to the Executive Agreement states a Competing Business "means the sale, marketing or promotion of information security and compliance products and services as a reseller or channel partner to the manufacturer or developer thereof, including without limitation, providing information security and compliance consulting services and/or managed security services." Ex. D to the Executive Agreement (Ex. A) at ¶ 17.2.

73.     Paragraph 17.3 of Exhibit D to the Executive Agreement states that "A person shall be deemed to be engrained in 'Competition' if such Person, or any of such Person's subsidiaries or parent companies is engaged in a Competing Business." Ex. D to the Executive Agreement (Ex. A) at ¶ 17.3.

74.     Paragraph 3 of Exhibit D to the Executive Agreement provides that Optiv is entitled to "(a) a decree or order of specific performance to enforce the observance and performance of such covenant or obligation; and (b) an injunction restraining such breach or threatened breach." Ex. D to the Executive Agreement (Ex. A) at ¶ 3.

75.     Paragraph 12 of Exhibit D to the Executive Agreement provides that the "substantially prevailing party shall be entitled to recorder reasonable attorneys' fees, cost and disbarments." Ex. D to the Executive Agreement (Ex. A) at ¶ 12.

76.     In paragraph 7 of Exhibit D to the Executive Agreement, Brady "specifically

acknowledges and agrees that the promises and restrictive covenants [Brady] is providing in this Agreement are reasonable and necessary to the protection of the Company's business and to the Company's legitimate interests in the transactions contemplated in the Merger Agreement." Ex. D to the Executive Agreement (Ex. A) at ¶ 7.

77.     On January 27, 2017, Brady signed an acknowledgement that, in exchange for receiving certain options from Optiv, that he agreed to the terms of a Management Stockholders Agreement, Sale Participation Agreement, and Option Rollover Agreement (the "Management Stockholders Agreement"). *See* **Exhibit B**.

78.     Throughout his employment, Brady was given Option Grants on March 11, 2017 (which was amended on December 12, 2017), January 2, 2019, February 24, 2021, March 2, 2022, and March 1, 2023 ("Option Grants"). *See* **Exhibits C, D, E, F, G and H**, respectively.

79.      Each of the Option Grants state in Section 5.5 that:

The Option and the Shares issued to the Optionee upon exercise of the Option shall be subject to all of the terms and provisions of the Plan and the Management Stockholder's Agreement and the Sale Participation Agreement, to the extent applicable to the Option and such Shares.

Exs. C, D, E, F, G and H.

80.     Thus, for each Option Grant that Brady entered into, he reaffirmed his obligations under the Management Stockholders Agreement.

81.     The Management Stockholders Agreement contains certain covenants regarding Optiv's Confidential Information, non-competition, and non-solicitation.

82.     Specifically, Paragraph 22(a)(i) of the Management Stockholders Agreement states that Brady agrees that during his employment with Optiv and for twelve (12) months following the end of his employment with Optiv, that he will not, in the U.S.:

whether as owner, manager, officer, director, employee or otherwise: (A) be

engaged or employed by any entity that directly competes with the business of any member of the Company Group, to perform duties and responsibilities that are the same or substantially related to the duties and responsibilities that the Management Stockholder performed for the Company Group at any time during the twenty-four (24) months prior to the Termination Date; or (B) solicit the business of, or accept business from any Customer of any member of the Company Group at the Termination Date, unless the business being solicited or accepted is not in competition with or substantially similar to any member of the Company Group's business.

Ex. B, at Para. 22(a)(i).

83.     The Management Stockholders Agreement defines "Customer" as:

any person or legal entity (and its subsidiaries, agents, employees and representatives) about whom the Management Stockholder has acquired material information based on employment with the Company Group and as to whom the Management Stockholder has been informed that the Company Group provides or will provide services.

Ex. B, at Para. 22(a)(ii).

84.     Paragraph 22(a)(iii) of the Management Stockholders Agreement states:

The Management Stockholder may not, at all times while the Management Stockholder is employed by any member of the Company Group and for the twelve (12) month period following any Termination Date, directly or indirectly, solicit or induce (or attempt to solicit or induce) to leave the employ of any member of the Company Group for any reason whatsoever any person employed by any member of the Company Group at the time of the act of solicitation or inducement, or employ or hire any such person.

Ex. B, at Para. 22(a)(iii).

85.     Paragraph 22(a)(iv) of the Management Stockholders Agreement states, in pertinent part:

The Management Stockholder may not at any time (whether during or after the Restricted Period) make public, disclose, divulge, furnish, release, transfer, sell or otherwise make available to any person any Confidential Information, or otherwise use or disclose it or allow it to be used or disclosed for any purpose, other than as may be permitted under this Agreement.

90542583.1

Ex. B., at Para. 22(a)(iv).

86.     The Management Stockholders Agreement is governed by the laws of the State of Delaware.  Ex. B., at Para. 17.

87.     Paragraph 17(c) of the Management Stockholders Agreement provides that Optiv "shall be entitled to injunctive or other relief in order to enforce the covenant not to compete, covenant not to solicit, and/or confidentiality covenants." Ex. B, at Para. 17(c).

### Defendant's Misconduct

88.     On June 30, 2023, Brady resigned his employment with Optiv.

89.     Brady's last day with Optiv was scheduled for August 4, 2023.

90.     Brady informed Optiv that he was becoming employed by GDT as its Chief Financial Officer. Optiv anticipates that he will be starting with GDT on or about August 7, 2023.

91.     GDT is a competitor of Optiv in that has recently decided to grow its cybersecurity presence and offer similar cybersecurity products and services to its customers.

92.     Upon information and belief, GDT has historically been engaged in the information technology infrastructure space and industry.

93.     Optiv is not engaged in the technology infrastructure space or industry.

94.     Like Optiv, GDT is an international company with customers across multiple continents.

95.     In 2023, GDT specifically decided to increase its cybersecurity division of its business.

96.     On May 8, 2023, GDT issued a press release that stated, "GDT Doubles Down on Cybersecurity by Launching Dedicated Practice." *See* **Exhibit I**.

97.     Upon information and belief, GDT has not been significantly engaged in the

cybersecurity industry prior to their announcement.

98.     Indeed, the first paragraph of the May 8, 2023, press release states that GDT "has launched a dedicated cybersecurity practice staffed with industry leading senior advisors and technical staff to help customers incorporate modern, risk-based security across their business."

99.     GDT's website states that GDT has three different cybersecurity offerings: Advisory/ Consulting; SOC as a service; and Secure Access Services Edge.

100.     All three of GDT's cybersecurity offerings are offered as services and offerings by Optiv.

101.     GDT now lists on its website, at gdt.com/about-gdt/, seven "Strategic Partnerships" including Cisco, Hewlett Packard Enterprise, Juniper Networks, NetApp, Fortinet, Aruba, and Palo Alto. *See* **Exhibit J**.

102.     The companies that comprise GDT's "Strategic Partnerships" are also strategic partner of Optiv.

103.     By partnering with these companies, GDT is further evidencing its attempted growth into the cybersecurity industry to compete with Optiv and beyond GDT's historic product and service offerings.

104.     As Chief Financial Officer, Brady has expansive knowledge of Optiv Confidential Information regarding what services Optiv and the industry are struggling with, what services customers and the industry are demanding, and market opportunities for services by the seven companies comprising GDT's "Strategic Partnerships."

105.     As Chief Financial Officer, Brady also has knowledge regarding preferred pricing programs with these "Strategic Partnerships" and Optiv's confidential pricing models, which will allow GDT to compete unfairly with Optiv.

106.    GDT recruited Brady for its Chief Financial Officer position because of his knowledge and experience with the cybersecurity industry – experience and knowledge that he would not otherwise have but for his employment with Optiv.

107.    Optiv anticipates that at GDT, Brady will perform the same roles and duties as Chief Financial Officer that he did while at Optiv.

108.    Brady will take with him to GDT knowledge of Optiv's confidential acquisition strategy regarding what areas are necessary to grow to expand and grow market share in the cybersecurity services and products industry.

109.    Knowledge and retention of this Confidential Information will undoubtedly inform Brady's strategic thinking, input, and decision making when it comes to his role in determining GDT acquisition strategy as it pertains to the cybersecurity industry.

110.    Brady's knowledge regarding customers' ability to pay for products and services and how Optiv's payment plan offering assists customers would provide GDT with an unfair competitive advantage.

111.    It will be impossible for Brady to complete his duties at GDT without revealing or using his knowledge of Optiv Confidential Information and trade secrets to the benefit of GDT and to the harm of Optiv.

112.    Optiv will be irreparably harmed by GDT receiving the playbook on how to become a major competitor in the cybersecurity industry through Brady's knowledge of Optiv's Confidential Information and trade secrets.

## COUNT I
## BREACH OF CONTRACT
### (Brady)

113.    Optiv realleges as if fully set forth herein the allegations contained in Paragraphs

1-112 above.

114.     On or about January 22, 2015, Brady entered into the Executive Agreement.

115.     The Executive Agreement between Optiv and Brady is a valid and enforceable contract in which Brady agreed, among other things, to abide by restrictions as to his use and retention of Confidential Information and trade secrets.

116.     These restrictions are necessary to protect Optiv's important and legitimate business interests, including, but not limited to, Optiv's Confidential Information and trade secrets, other protected commercial information, relationships with established customers, relationships with current employees, and goodwill.

117.     Brady has not been expressly authorized by the Board of Directors to disclose Optiv's Confidential Information or trade secrets.

118.     By nature of his highly strategic executive role as Chief Financial Officer, Brady is unable to divorce his intimate knowledge of Optiv's trade secrets and Confidential Information from his decision making, advice, and input in growing GDT's cybersecurity team.

119.     By accepting employment with a direct competitor seeking to expand its footprint in the same industry as Optiv, Brady has entered a contract that is in conflict with his obligations in the Executive Agreement, which constitutes as breach of the Executive Agreement contemplated in Paragraph 1.4 of Exhibit C to the Executive Agreement.

120.     By virtue of his employment with GDT, Brady has and will continue to violate the express terms of the Executive Agreement, including the confidentiality and non-solicitation provisions.

121.     Optiv has been damaged and will continue to be damaged as Brady is able to assist a new competitor quickly develop its position in the cybersecurity industry.

122.    Thus, Optiv is entitled to injunctive relief against Brady.

123.    Optiv is entitled to damages, for its loss due to Brady's breach to the extent they can be quantified and calculated.

124.    As a result of Brady's breach of the Executive Agreement, Optiv is entitled to attorneys' fees.

## COUNT II
## BREACH OF CONTRACT
## (Brady)

125.    Optiv realleges as if fully set forth herein the allegations contained in Paragraphs 1-124 above.

126.    On or about January 22, 2015, Brady entered into the Executive Agreement.

127.    The Executive Agreement between Optiv and Brady is a valid and enforceable contract in which Brady agreed, among other things, to certain noncompetition restrictions for the period of one year following the termination of his employment.

128.    These restrictions are necessary to protect Optiv's important and legitimate business interests, including, but not limited to, Optiv's Confidential Information and trade secrets, other protected commercial information, Optiv's market share, Optiv's relationship with customers, and the good will that it has developed over decades in the industry.

129.    The restrictions contained in the Agreement are reasonable and narrowly tailored with respect to geographic area and duration.

130.    As evidenced in Ex. I, GDT is a Competing Business as defined in the Executive Agreement.

131.    GDT and Brady, by nature of Brady's employment with GDT, are engaged in Competition with Optiv as defined in the Executive Agreement.

132.    Brady has engaged in Competition with Optiv alongside a Competition Business during the Restricted Period in violation of the Executive Agreement.

133.    By virtue of his employment with GDT, Brady has and will continue to violate the express terms of the Executive Agreement, including the non-competition provisions during the Restricted Period.

134.    Optiv has been damaged and will continue to be damaged as Brady is able to assist a new competitor quickly develop its position in the cybersecurity industry.

135.    Optiv is entitled to injunctive relief against Brady.

136.    Optiv is entitled to damages, for its loss due to Brady's breach to the extent they can be quantified and calculated.

137.    As a result of Brady's breach of the Executive Agreement, Optiv is entitled to attorneys' fees.

**COUNT III**
**BREACH OF CONTRACT**
**(Brady)**

138.    Optiv realleges as if fully set forth herein the allegations contained in Paragraphs 1-137 above.

139.    On or about February 27, 2017, Brady entered into the Management Stockholder Agreement.

140.    The Management Stockholder Agreement between Optiv and Brady is a valid and enforceable contract in which Brady agreed, among other things, to abide by restrictions as to his use and retention of Confidential Information and trade secrets.

141.    These restrictions are necessary to protect Optiv's important and legitimate business interests, including, but not limited to, Optiv's Confidential Information and trade secrets,

other protected commercial information, relationships with established customers, relationships with current employees, and goodwill.

142.    Brady has not been expressly authorized by the Board of Directors to disclose Optiv's Confidential Information or trade secrets.

143.    By nature of his highly strategic executive role as Chief Financial Officer, Brady is unable to divorce his intimate knowledge of Optiv's trade secrets and Confidential Information from his decision making, advice, and input in growing GDT's cybersecurity team.

144.    By accepting employment with a direct competitor seeking to expand its footprint in the same industry as Optiv, Brady has entered a contract that is in conflict with his obligations in the Management Stockholder Agreement, which constitutes as breach of the Management Stockholder Agreement contemplated in Paragraph 22 to the Management Stockholder Agreement.

145.    By virtue of his employment with GDT, Brady has and will continue to violate the express terms of the Management Stockholder Agreement, including the confidentiality and non-solicitation provisions.

146.    Optiv has been damaged and will continue to be damaged as Brady is able to assist a new competitor quickly develop its position in the cybersecurity industry.

147.    Thus, Optiv is entitled to injunctive relief against Brady.

148.    Optiv is entitled to damages, for its loss due to Brady's breach to the extent they can be quantified and calculated.

149.    As a result of Brady's breach of the Management Stockholder Agreement, Optiv is entitled to attorneys' fees.

90542583.1

## COUNT IV
## BREACH OF CONTRACT
## (Brady)

150.   Optiv realleges as if fully set forth herein the allegations contained in Paragraphs 1-149 above.

151.   On or about February 27, 2017, Brady entered into the Management Stockholders Agreement.

152.   The Management Stockholders Agreement between Optiv and Brady is a valid and enforceable contract in which Brady agreed, among other things, to certain noncompetition restrictions for the period of one year following the termination of his employment.

153.   These restrictions are necessary to protect Optiv's important and legitimate business interests, including, but not limited to, Optiv's Confidential Information and trade secrets, other protected commercial information, Optiv's market share, Optiv's relationship with customers, and the good will that it has developed over decades in the industry.

154.   The restrictions contained in the Management Stockholders Agreement are reasonable and narrowly tailored with respect to geographic area and duration.

155.   As evidenced in Ex. I, GDT is a Competing Business as defined in the Management Stockholders Agreement.

156.   GDT and Brady, by nature of Brady's employment with GDT, are engaged in Competition with Optiv as defined in the Management Stockholders Agreement.

157.   Brady has engaged in Competition with Optiv alongside a Competition Business during the Restricted Period in violation of the Management Stockholders Agreement.

158.   By virtue of his employment with GDT, Brady has and will continue to violate the express terms of the Management Stockholders Agreement, including the non-competition

provisions during the Restricted Period.

159.    Optiv has been damaged and will continue to be damaged as Brady is able to assist a new competitor quickly develop its position in the cybersecurity industry.

160.    Optiv is entitled to injunctive relief against Brady.

161.    Optiv is entitled to damages, for its loss due to Brady's breach to the extent they can be quantified and calculated.

162.    As a result of Brady's breach of the Executive Agreement, Optiv is entitled to attorneys' fees

## COUNT V
## TORTIOUS INTERFERENCE WITH CONTRACT
## (GDT)

163.    Optiv realleges as if fully set forth herein the allegations contained in Paragraphs 1-162 above.

164.    On or about January 22, 2015, Brady entered into an Executive Agreement that contained restrictive covenants.

165.    The Executive Agreement between Optiv and Brady is a valid and enforceable contract in which Brady agreed, among other things, to abide by restrictions as to his use and retention of Confidential Information and to not become employed by a competitor of Optiv.

166.    Upon information and belief, GDT was aware of Brady's Executive Agreement with Optiv when they chose to hire him.

167.    Upon information and belief, GDT hired Brady as part of their strategic initiative to enter and expand their presence in the cybersecurity industry.

168.    By hiring Brady with knowledge of the Executive Agreement, GDT intentionally interfered with the Executive Agreement between Brady and Optiv.

90542583.1

169.   GDT had no justification for its intentional interference with the Executive Agreement between Optiv and Brady.

170.   As a direct and proximate cause resulting from the actions of GDT, Optiv has sustained damages.

171.   The conduct of GDT, as alleged in Count V, was willful and malicious and demonstrates a complete indifference to or a conscious disregard for the rights of Optiv.

**COUNT VI**
**TORTIOUS INTERFERENCE WITH CONTRACT**
**(GDT)**

172.   Optiv realleges as if fully set forth herein the allegations contained in Paragraphs 1-171 above.

173.   On or about February 27, 2017, Brady entered into a Management Stockholder Agreement that contained restrictive covenants.

174.   The Management Stockholder Agreement between Optiv and Brady is a valid and enforceable contract in which Brady agreed, among other things, to abide by restrictions as to his use and retention of Confidential Information and to not become employed by a competitor of Optiv.

175.   GDT was aware of Brady's Management Stockholder Agreement with Optiv when they chose to hire him.

176.   GDT hired Brady as part of their strategic initiative to enter and expand their presence in the cybersecurity industry.

177.   By hiring Brady with knowledge of the Management Stockholder Agreement, GDT intentionally interfered with the Management Stockholder Agreement between Brady and Optiv.

178.   GDT had no justification for its intentional interference with the Management

Stockholder Agreement between Optiv and Brady.

179.    As a direct and proximate cause resulting from the actions of GDT, Optiv has sustained damages.

180.    The conduct of GDT, as alleged in Count VI, was willful and malicious and demonstrates a complete indifference to or a conscious disregard for the rights of Optiv.

## COUNT VII
## VIOLATION OF DEFEND TRADE SECRETS ACT
## 18 U.S.C. § 1836 et seq.
## (Brady)

181.    Optiv realleges as if fully set forth herein the allegations contained in Paragraphs 1-180 above.

182.    Optiv owns trade secrets and Confidential Information that derive independent economic value, actual or potential, and are not generally known or ascertainable but through improper means.

183.    Optiv takes and has taken reasonable measures to keep such information secret. For example, Optiv maintains its Confidential Information and trade secrets – such as market and sales strategies, pricing and financial information – on a protected network which requires company authorization to access, a password is required to access such information, and access is limited to those individuals who require the use of the Confidential Information and trade secrets as part of their duties.

184.    Optiv's trade secrets are related to cybersecurity products and services that are used and sold in interstate commerce.

185.    Brady has substantial and intimate knowledge of Optiv's trade secret and Confidential Information as Optiv's former Chief Financial Officer who played an integral role in Optiv's emergence as an industry leader.

186.     Optiv faces threatened misappropriation of its trade secrets and Confidential Information due to Brady taking a substantially similar role at GDT at the same time as it plans to enter and expand its footprint in the cybersecurity market.

187.     Brady is unable to divorce his knowledge of Optiv's trade secrets and Confidential Information from decision making and strategic input that he will be required to do at GDT.

188.     As a direct and proximate result of Brady becoming employed by GDT, Optiv has been and will continue to be damaged.

## COUNT VIII
## VIOLATION OF KANSAS TRADE SECRETS ACT
## K.S.A. 60-3320 et seq.
## (Brady)

189.     Optiv realleges as if fully set forth herein the allegations contained in Paragraphs 1- 188 above.

190.     Information on Optiv's corporate strategic plans, sales goals, sales and go-to-market data, strategies and methodologies, services and operational manuals, financial information (including pricing data), and vendor information constitutes trade secrets, pursuant to K.S.A. 60-320(4), because Optiv derives independent economic value from such information not being generally known to, and not being readily ascertainably by proper means by, other persons who can obtain economic value from its disclosure or use.

191.     Indeed, these trade secrets pursuant to K.S.A. 60-320(4) were instrumental in Optiv becoming an industry leader.

192.     Brady expressly acknowledged and agreed to Optiv's definition of Confidential Information.

193.     Optiv took reasonable precautions under the circumstances to protect its trade secrets, and all parties with access to its trade secrets (including Brady) were subject to obligations

to maintain their secrecy.

194.     Brady, as Chief Financial Officer of Optiv, had access to information that consisted of Optiv's trade secrets, including, but limited to, corporate strategic plans, sales goals, sales and go-to-market data, strategies and methodologies, services and operational manuals, financial information (including pricing data), internal prospect lists, customer lists, customer contact information, customer purchase records, customer security issues, and vendor information by virtue of the trust and confidence Optiv placed in him and through his express written agreement to not disclose such information.

195.     Brady has substantial and intimate knowledge of Optiv's trade secret and Confidential Information as Optiv's former Chief Financial Officer who played an integral role in Optiv's emergence as an industry leader.

196.     Optiv faces threatened misappropriation of its trade secrets and Confidential Information due to Brady taking a substantially similar role at GDT at the same time as it plans to enter and expand its footprint in the cybersecurity market.

197.     Brady is unable to divorce his knowledge of Optiv's trade secrets and Confidential Information from decision making and strategic input that he will be required to do at GDT.

198.     As a direct and proximate result of Brady's threatened misappropriation of Optiv's trade secrets, Optiv will suffer damages.

199.     The actions of Brady, as alleged in Count V, were willful and malicious and demonstrate a complete indifference to or a conscious disregard for the rights of Optiv.

## COUNT IX
## CIVIL CONSPIRACY
### (All Defendants)

200.     Optiv realleges as if fully set forth herein the allegations contained in Paragraphs

1-199 above.

201.    Upon information and belief, Defendants agreed and conspired together to cause Brady to unlawfully breach his Executive Agreement and Management Stockholders Agreement, and Brady and GDT to improperly use Optiv's Confidential Information.

202.    In furtherance of the above-described agreement and conspiracy, Defendants committed unlawful and overt acts, including, without limitation, GDT hiring Brady to work in a competitive capacity to Optiv; and GDT encouraging and/or allowing Brady to misappropriate, disclose, and/or use Optiv's Confidential Information and Trade Secrets for GDT's benefit and to Optiv's detriment.

203.    As a direct and proximate result of Defendants' conspiracy, Optiv has been and will continue to be damaged.

204.    Optiv has no adequate remedy at law, as Optiv's injuries cannot be fully quantified, and the balance of equities and public interest favor entering temporary and preliminary injunctive relief against Defendants.

205.    Optiv is therefore entitled to all available injunctive relief (including a temporary restraining order and preliminary injunction) against Defendants to enjoin actual or threatened misappropriation, use, and/or dissemination of its Confidential Information and Trade Secrets; to prevent Brady and GDT from continuing to profit from the past use of Optiv's Confidential Information wrongfully procured from Brady in violation of his Agreements; to prevent GDT from continuing to employ Brady; and to prevent Brady or GDT from soliciting Optiv customers that it would not have serviced but for Brady's breach of his Agreement

206.    Additionally, as a direct and proximate result of the wrongful conduct of Defendants, Optiv has been irreparably harmed and will continue to be irreparably harmed

through the loss of Optiv clients, employees, goodwill, revenues, and profits; impairment of future earning capacity; and diminution in the value of its business.

207.    Unless Defendants are enjoined, this misconduct will continue, and Defendants will continue to cause Optiv to suffer losses, including the retention, disclosure and impermissible use of its confidential information and trade secrets, and the loss of clients, employees, future revenues and goodwill, to the irreparable injury of Optiv.

**COUNT X**
**UNJUST ENRICHMENT**
**(GDT)**

208.    Optiv realleges as if fully set forth herein the allegations contained in Paragraphs 1-207 above.

209.    GDT has been unjustly enriched by Brady's breach of his non-competition covenants and obligations regarding Optiv's confidential information.

210.    GDT will continue to be enriched by receiving economic benefit from the use of Optiv's confidential information and trade secrets.

211.    GDT is aware and on notice of Brady's obligations to Optiv and that Brady's employment with GDT will require the use of Optiv's confidential information and trade secrets to GDT's benefit; yet GDT has not ceased its plan on hiring Brady.

212.    It is unjust for GDT to retain the benefits from the unlawful procurement of Optiv's trade secrets and confidential information.

213.    As a direct and proximate result of the wrongful conduct of GDT, Optiv has been irreparably harmed and will continue to be irreparably harmed through the loss of Optiv clients, employees, goodwill, revenues, and profits; impairment of future earning capacity; and diminution in the value of its business.

## COUNT XI
## INJUNCTIVE RELIEF AND TEMPORARY RESTRAINING ORDER

214. Optiv realleges as if fully set forth herein the allegations contained in Paragraphs 1- 213 above.

215. Brady is unable to divorce his intimate knowledge of Optiv's trade secrets and Confidential Information.

216. Brady has agreed in the Executive Agreement and Management Stockholders Agreement that he will not divulge or disclose to his employer's detriment any trade secrets or other Confidential Information which he has acquired in the course of his employment, and Optiv is therefore entitled to a preliminary and permanent injunction enjoining Brady from becoming employed by GDT during the restricted period.[1]

217. By nature of Brady's breach of his Executive Agreement and Management Stockholders Agreement and the restrictive covenants contained therein, Optiv has and will continue to suffer irreparable injury unless Brady is enjoined from becoming employed by GDT.

218. Optiv has no adequate remedy at law to stop the continued and future damage Defendants have caused by their unlawful conduct, as Optiv's injuries cannot be fully quantified, and the balance of equities and public interest favor entering preliminary injunctive relief against Defendants.

219. Optiv is therefore entitled to preliminary and permanent injunctive relief against

---

[1] Delaware Law specifically recognizes a key justification of a noncompete is to prevent an employee who has learned the trade secrets and confidential information from becoming employed by a competitor during the restricted period. As such, an employer should be entitled to injunctive relief to protect the basis for the contract. *See Cabela's LLC v. Wellman*, No. 2018-0607-TMR, 2018 WL 5309954 (Del. Chan. Oct. 26, 2018); *see also E.I duPont de Nemours & Co. v. American Potash & Chemical Corp.*, 200 A.2d 428, 431 (Del. Ch. May 5, 1964).

Defendants to enjoin actual or threatened misappropriation, use, and/or dissemination of its Confidential Information and trade secrets; and to prevent Defendants from continuing to profit from the use of Optiv's wrongfully procured Confidential Information and trade secrets.

220.     Unless Defendants are enjoined, this misconduct will continue, and Defendants will continue to cause Optiv to suffer losses, including the retention, disclosure and impermissible use of its Confidential Information and trade secrets, and the loss of established customers, employees, future revenues and goodwill, to the irreparable injury of Optiv.

## PRAYER FOR RELIEF

WHEREFORE, Optiv requests the following relief:

1.     A temporary restraining order enjoining Brady from being employed by GDT during the restricted period or from any further breach of his obligations under the Executive Agreement or Management Stockholders Agreement;

2.     A preliminary and permanent injunction enjoining Brady from being employed by GDT during the restricted period or from any further breach of his obligations under the Executive Agreement or Management Stockholders Agreement;

3.     An order of specific performance for Brady to abide by the terms of the Executive Agreement, including Exhibit C and Exhibit D to the Executive Agreement;

4.     An order of specific performance For Brady to abide by the terms of Paragraph 22 of the Management Stockholders Agreement;

5.     An award of attorneys' fees and costs of suit incurred herein against Defendants;

6.     An order requiring Brady to return immediately any Confidential Information and trade secrets to Optiv currently in the possession of Brady and/or GDT, and affirm that they no longer have any Confidential Information in any format in their possession, custody, or control;

7.      A temporary restraining order against GDT enjoining it from either directly or indirectly tortiously interfering with or conspiring with Brady to violate the Executive Agreement or Management Stockholders Agreement with Optiv, including being enjoined from encouraging, supporting, investing, enabling, and/or concealing breaches of the Executive Agreement or Management Stockholders Agreement with Optiv;

8.      A preliminary and permanent injunction against GDT enjoining it from either directly or indirectly tortiously interfering with or conspiring with Brady to violate the Executive Agreement or Management Stockholders Agreement with Optiv, including being enjoined from encouraging, supporting, investing, enabling, and/or concealing breaches of the Executive Agreement or Management Stockholders Agreement with Optiv;

9.      A preliminary injunction, and permanent injunction against GDT enjoining it from either directly or indirectly participating in or receiving or retaining benefits from the violation of Brady's Executive Agreement or Management Stockholders Agreement with Optiv, including being enjoined from encouraging, supporting, investing, enabling, and/or concealing Brady's breach of his Executive Agreement or Management Stockholders Agreement with Optiv, and from otherwise depriving Optiv of the benefit of its bargain under its Executive Agreement with Brady;

10.     Monetary damages, to the extent they can be calculable, Optiv experiences due to Brady and GDT's conduct;

11.     Such other and further relief as is deemed just and proper.

## **JURY DEMAND**

Optiv requests trial by jury.

90542583.1

## <u>DESIGNATION OF PLACE OF TRIAL</u>

Plaintiff requests Kansas City, Kansas as the place of trial.

Respectfully submitted,

POLSINELLI PC

By:   /s/ *Robert J. Hingula*
ROBERT J. HINGULA (KS #22203)
ISAAC T. CAVERLY (D.Kan. #78968)
900 W. 48th Place, Suite 900
Kansas City, MO 64112
Telephone: (816) 753-1000
Facsimile: (816) 753-1536
rhingula@polsinelli.com
icaverly@polsinelli.com

ATTORNEYS FOR PLAINTIFF

90542583.1

STATE OF California )
                                    ) ss
COUNTY OF Orange )

## VERIFICATION

Comes Now Kevin Lynch, being duly sworn and under oath, and states that he is the Chief Executive Officer of Optiv Security Inc., and that he has read the foregoing Verified Complaint For Injunctive And Other Relief. Affiant further states that he has personal knowledge of the facts alleged therein, and that the facts stated in the Verified Complaint for Injunctive Relief and Damages are true and accurate to the best of his knowledge and belief.

DATED: 07/25/2023

On this 25 day of July , personally appeared the above-named Kevin Lynch , being duly sworn and to me persoanlly known, and acknowledged the foregoing to be his free act and deed before me.

NOTARY PUBLIC

My Commission Expires: 06/10/2027

[SEAL]

EVAN BISSETT
COMM. #2449832
Notary Public - California
Orange County
My Comm. Expires June 10, 2027

90542583.1